**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **No. 04-10288-RWZ** |
| **CARLOS ESPINOLA** | ) | |

**CARLOS ESPINOLA'S MOTION FOR DOWNWARD DEPARTURE;**
**MEMORANDUM IN SUPPORT OF DOWNWARD DEPARTURE**
**AND FOR IMPOSITION OF NON-GUIDELINES SENTENCE**

**NOW COMES CARLOS ESPINOLA** who after trial, was convicted by a jury of his peers of the following Count:

1. ***Conspiracy to Possess with Intent to Distribute, and to Distribute Oxycodone, 21 U.S.C. § 846.***

He thus presents his Motion for Downward Departure of Sentence, formally Objects to the pill quantity and firearm attributed to him by the United States Attorney's office and United States Probation Office (contained within its Report), and provides his Memorandum in Support herewith.

**A. PREFACE**

Notwithstanding his cognizance of the punishment this Honorable Court may seek to impose on Mr. Espinola, in each and every instance, the Government has with ardent zeal sought to characterize this case as "a (career-long) 'eye-opener'…" "…that lives were devastated, destroyed by this horrible, horrible drug…" "a horrible situation that has brought disastrous consequences, not only on the multitudes of people who have used it as a direct result of the actions of [co-defendant Baldassano] in and around Gloucester, but on the community itself." See, e.g.: *Baldassano Sentencing Hearing*, June 29, 2006 at 15-16.

Further, the Government, during Mr. Espinola's trial, and in the sentencing of his co-defendants, has characterized the applicable conduct as distribution to the public a quantity of pills in excess of *20,000*: "…our position is that [Baldassano] is responsible for approximately 20,800 pills. If this Court were to accept that and, in fact, gave him a role enhancement that the United States would be asking for, then he would have a guideline range between 235 and 293 months, recognizing, of course, there is no minimum mandatory when we're dealing with Oxycontin." See: *Baldassano Rule 11 Hearing*, April 18, 2006 pp. 8-9." "I don't think we can overstate the horrible situation brought by Oxycontin, particularly on the North Shore, Cape Ann, and Gloucester. This is a

plague and it is destroying communities, certainly destroying families, and destroying individuals, and I suspect the courtroom is filed with individuals who know the perils of Oxycontin, individuals who know what is has done to [Matthew Cream]. This is bad stuff." Id. pp 64-65.

In light of such a contention, the Government's zeal to prosecute this "horrible situation" was disingenuously ***selective*** however. It relied in large part on the impure testimony of unindicted co-conspirators; many with severe criminal histories, histories of significant drug sales [some within this conspiracy], large-scale possession/abuse, an immunized witness with psychiatric problems, drug sales/abuse, an attempted suicide, and, a cooperating witness who admitted to numerous falsehoods (e.g. Baldassano, Caverly, Teixeira, Dawicki, Prendergast). Further, it should be noted that during Mr. Espinola's trial, of the many agents that testified, *no law enforcement officer, at any point in the development of this case, observed Mr. Espinola engaged in any illicit activity;* despite the involvement of over 50 state and federal agents, 10 months of round-the-clock surveillance, and a *consensual* search of Mr. Espinola's residence upon his [surprise] arrest. Neither did the Government discover any OxyContin, nor did it seize, or move for forfeiture, any "fruits" of his alleged enterprise---he had no cash, no luxury items, no extravagant indulgences so commonly attributable to those who make purchases with funds acquired through the drug trade.

For Sentencing purposes, Mr. Espinola objects to the Presentence Report and/or the contention of the Government attributing a tablet quantity to him any where near, and certainly not over 2,400, or an enhancement of his sentence based on his alleged possession of a firearm. (The firearm will be addressed separately, *infra*.) The witnesses relevant to Mr. Espinola's Sentencing Memorandum and included herewith are as follows:

**B. PILL QUANTITY**

**1. Joseph Baldassano:** the college educated "career drug dealer" and cooperating witness who from the date of his arrest in June, 2004 sought a 5K1.1 downward departure for his assistance in the prosecution of his co-defendants. THE COURT: "I have some trouble with Mr. Baldassano's testimony. He blithely talks about [Mr. Cream] being a partner, but then he gives Mr. Cream money when Mr. Cream needs money for one thing or another. That doesn't sound like a partnership to me. It sounds like some kind of a master/servant relationship rather than a partnership… Now that doesn't fully take care of this issue that the Government has raised as to

whether the quantity that probation has determined is accurate, which is the only way for which [Mr. Cream] should be held accountable is the amount that Probation found him to be accountable for. **Mr. Baldassano's testimony is too free, too open, too conclusory to allow me to make any more accurate determination**." Id., pp 38-39. (Emphasis added) In fact, Mr. Baldassano's truthfulness has *always* been questionable. During the trial, the Government played a tape recording of Mr. Baldassano making the following statements: "If I buy 1000 or if I buy 5000 (pills---presumably from Mr. Espinola **and/or** an unindicted person he described as "Mario") they're always the same price." The Government queries: "Can you explain to us what you were saying there?" to which Mr. Baldassano states, "Well, referring to 'them' as Carlos and Mario. They would never run out. And 1,000, 5000, that was – that was a lie." *United States v. Espinola*, Jury Trial Day Five, pp. 28-30. The Government continues of Mr. Baldassano: "Then later on…you say 'I got people that buy 1000, 2000 a week.' "Did you have those people? Mr. Baldassano replied "No." Id.[1]

As it has done with *every* co-defendant in this case, the Government seeks to attribute to Mr. Espinola an astronomical tablet quantity (in Mr. Espinola's case, 20,330 pills) with an ultimate Base Offense Level of 38 and guideline imprisonment range of 235 to 293 months. [19 to 24 *years* (!)] See: *Letter to U.S. Probation Officer Tricia Marcy*, July 21, 2006, p. 2. Mr. Espinola asks this most Honorable Court to reject, as it has with every co-defendant now sentenced, the government's position as nothing more than righteously speculative hyperbole. As explained herein, the government's numbers are inherently unreliable, and in fact were *specifically discounted by the Court* at Mr. Baldassano's Sentencing Hearing of June 29, 2006.

---

[1] Mr. Baldassano's testimony has historically been questionable and unreliable. In the sentencing hearings in which he has appeared, as well as at trial, he was rife with contradictions to direct questions, admitted falsehoods, and "vacillations" in attempt to rehabilitate his prior statements. The purpose of this document is not to cite each instance of such unreliability, as most respectfully, the Honorable Court has access to the same transcripts as Mr. Espinola. On the issues of "sole supplier" and "pill quantity," Mr. Espinola objects to the Government's contentions that he was Mr. Baldassano's *sole supplier* (for which it seeks to attribute not only a *linear* "pill count"---Mr. Baldassano's "pill quantity" is *ergo* Mr. Espinola's (contradicting Mr. Baldassano, who stated, that he purchased pills on "at least two or three occasions from Mr. DeSilva," Id at p. 79, and "approximately five to ten times" with pill quantities between "100 to 500" from Mr. Melo. Id. at p. 81.) but also the Government's *gargantuan* attribution beyond 3,100, as addressed herein. Aside from Mr. Baldassano's unsupported assertion that Mr. Espinola was somehow integral in linking him to Mr. DeSilva and/or Mr. Melo, there was no reliable corroboration of his, or the Government's position. The Government's pill quantity attributable to Mr. Espinola is ridiculously exaggerated and most importantly, unsubstantiated.

The Court accepted United States Probation's tablet quantity in the amount of *3100 pills; the quantity correlated directly to the **transactions** in which Mr. Baldassano was involved*. It follows logically that Mr. Espinola cannot be held accountable for tablets in excess of those attributed to Mr. Baldassano, even if one were to rely on the Government's position that Mr. Espinola was Mr. Baldassano's *sole* source of supply, which it was determined he was not (other suppliers being Melo, DeSilva, etc.):

Keene: "So your statement, then, that [Espinola] was your sole supplier is a misrepresentation, is it not?"

Baldassano: "Correct." *United States v. Espinola*, Jury Trial Day 6, p. 16.

As aforesaid, the Presentence Report attributed a tablet quantity to Mr. Espinola as follows:

> As the defendant was ***a*** source of supply of OxyContin to Baldassano during the conspiracy period, the Probation Office is starting with the total weight of Oxycodone that was attributed to Baldassano by the Court. The Court, pursuant to U.S.S.G. § 1B1.3(a) (1) (A) & (B), attributed 3,100 pills to Baldassano**.** Of this amount, a conservative estimate of 200 pills was supplied to Baldassano by Baldassano's **supplier** and a conservative estimate was **supplied by Melo** (see paragraphs 117 and 118). Since Espinola was not involved in these transactions, the Probation Office is subtracting 700 pills from the 3,100 pills for which the Court held Baldassano accountable. **The result is 2,400 pills.** (Emphasis added)

While he will ultimately ask the Court to significantly depart downward from 2,400 pills for the reasons discussed herein, Mr. Espinola respectfully asks the Court to adopt at maximum, no more than 2,400 pills as the tablet number attributable to him.

**2.** **Ryan Caverly:** One of the government's plethora of witnesses, if believed, an unindicted co-conspirator (in this "eye-opener") with an extensive criminal history including sale of Oxycontin (allegedly purchased from at least Baldassano and/or Espinola), and an extensive history of drug abuse, mental impairment and memory difficulties (three vicious beatings to the head; two requiring hospitalization) *United States v. Espinola*, Jury Trial Day 8 pp. 57-60 and admitted falsehoods. Id. p. 53. He testified that he had significant memory problems (as a result of the beatings). While the Presentence Report attributes 2,400 pills to Mr. Espinola allegedly acquired

directly by Mr. Caverly (100 pills per week for 24 weeks, beginning August 2002 and ending February 2003), (and the government seeks to attribute 2,800 to Mr. Espinola), Mr. Caverly testified differently:

(Mr. Tobin):   Can you estimate, sir, or give us an exact number, if you know, the total number of pills you

bought from Carlos Espinola during that period of time?

Mr. Caverly:  I couldn't really estimate.  Id. at 50.

(Mr. Keene)  You don't know how many times you allegedly purchased OxyContin from Mr. Espinola?

Mr. Caverly:  An exact time, no, I do not, sir.

Mr. Keene: And you don't have any idea how many pills in total you purchased from Mr. Espinola?

Mr. Caverly:  No not an exact number, no, I do not.  Id. at 63.

Based on Mr. Caverly's direct testimony, as well as his cross examination, Mr. Espinola asserts that, not only was this uncharged conduct, but a specific pill quantity cannot be ascertained. He thus requests this Honorable Court to exclude *in toto*, any pill quantity attributed to him via Mr. Caverly.

**3.   Michelle Dawicki:**   The Presentence Report is silent with respect Ms. Dawicki's acquisition of Oxycontin from Mr. Espinola.  Since the Report specifically references Ms. Dawicki's recollection of Mr. Espinola's alleged possession of a firearm, presumably the Report is silent because there is no accurate method of attributing pill quantity from Mr. Espinola to Ms. Dawicki, (which is also Mr. Espinola's contention.)  The government however, makes a specious and inflated stab at such an attribution, alleging that "she used up to five OxyContin tablets per day for the year she lived with the defendant.  The defendant supplied Dawicki with 'most' of the OxyContin she used. At two eighty milligram OxyContin tablets per day, 730 additional eighty milligram tablets should be added to the defendants total"  See:  *Letter to U.S. Probation Officer Tricia Marcy*, July 21, 2006, p. 2.  The government's argument should be rejected.  In fact, Ms. Dawicki could only *estimate* her Oxycontin usage attributed to Mr. Espinola:

(Mr. Tobin) "Where were you getting the Oxycontin?"

Ms. Dawicki:  "From [him]."

Mr. Tobin:  "Can you give us any indication as to how many 80-milligram pills?"

Ms. Dawicki:  "More than five a day."  See.  *United States v. Espinola*, Jury Trial Day 7 p. 15

Mr. Tobin:  "How did you come to leave the apartment where Carlos Espinola and you lived?"

Ms. Dawicki:  "Well, I was a junkie, and I *stole* a lot of money."

Mr. Tobin:  "You stole money from whom?"

Ms. Dawicki:  "From Carlos."

Mr. Tobin:  "Did you also *take* pills?"

Ms. Dawicki:  "Yes."  Id. at 19

Mr. Keene:  "So your recollections of what transpired may not in fact be necessarily accurate?"

Ms. Dawicki:  "I guess you could say that."  Id. at 26.

Mr. Keene:  "What kind of mental state were you in when you were taking OxyContin and crystal

meth and valium?

Ms. Dawicki: "I was a disaster."  Id. at 31

No testimony elicited from Ms. Dawicki supports the government's mathematical analysis and yet again it asks the Court to engage in speculation.  Further, a reading of her testimony indicates that not only was she a multi-drug addled psychotic (using Oxycontin, among many, many other mind-altering substances) and had suicidal ideations prior to meeting Mr. Espinola, but also that during the time of her relationship with Mr. Espinola she had "blackouts" and "hallucinations" Id. at p. 25, 33, and appeared to be acquiring a variety of illicit drugs from persons unknown. She in fact testified that she was using OxyContin *prior to meeting Mr. Espinola*. Id. at p. 8, 24.   The government's faulty and speculative contention should be rejected.

**C. THE FIREARM**

Mr. Espinola was not charged with possession of a firearm, nor was one recovered or seized from his person or residence. He objects to any sentence enhancement based on possession of such a weapon, and objects to the attribution to him of a firearm. The Presentence Report at paragraph 157 states:

> Several witnesses, including Baldassano, Dawicki, Caverly and Texeira testified that the defendant possessed a firearm inside his apartment where he sold and stored his Oxycontin pills, as well as possessed it when he delivered pills on at least one occasion. Accordingly, the offense level is increased two levels, pursuant to U.S.S.G § 2D1.1 (b) (1).

Mr. Espinola respectfully requests that this Honorable Court reject the allegation. Mr. Espinola was neither arrested with a firearm, nor was one confiscated from his residence. No firearm was introduced at trial, and no expert testified thereto. Further, the testimony of those that described a "gun" was speculative at best:

**Teixeira**: "I don't know anything about guns." *United States v. Espinola*, Jury Trial Day 8 p. 135

Keene: "So your characterization of Mr. Espinola having a 9-milimeter handgun is a complete fabrication, isn't it."

Teixeira: "Yes. It's just an assumption."

Keene: "You don't know whether it was a real gun or not?"

Teixeira: "Right."

**Baldassano**: (Keene cross-examination) "And my final question to you was, and I'm quoting, 'In fact, if we believe your testimony that he in fact had a gun, you have no idea whether this was a real firearm, a pellet gun, a toy gun, or a replica of a gun' is that correct?"

Baldassano: "Correct." *United States v. Espinola*, Jury Trial Day 7 p. 59.

**Dawicki**: (Keene, cross-examination) "Now, you mentioned that you observed a handgun in the

apartment, correct?"

Dawicki: "Yes."

Keene: "Did you ever see Mr. Espinola fire that gun?"

Dawicki: "No."

Keene: "Did you ever see whether or not the gun was loaded?"

Dawicki: "No."

Keene: "Do you have any idea what make or model of gun this was?"

Dawicki: "No."

Keene: "So it looked like a gun?"

Dawicki: "Yes."

Keene: "But you are not sure whether or not it was a real firearm, are you?"

Dawicki: "No."

Keene: "In fact it could have been a replica, couldn't it?"

Dawicki: "I guess so."

Keene: "Or a toy gun."

Dawicki: "Yup." *United States v. Espinola*, Jury Trial Day 7 p. 34.

Mr. Caverly's testimony is similarly flawed:

Keene (cross-examination): "Now this gun that you referenced Mr. Espinola having had in his apartment, did he fire that gun for you?"

**Caverly**: "No, it was just sitting in the case, sir."

Keene: "You didn't even touch it did you."

Caverly: "No, I did not."

Keene: "And you don't know the brand of that weapon, do you."

Caverly: "No I do not."

Keene: "And you don't know what size gun it was, do you."

Caverly" "No I do not, sir."

Keene: "So you have no idea whether it worked or not"

Caverly: "Right." *United States v. Espinola*, Jury Trial Day 8 pp. 73-75.

Furthermore, Special Agent Daniel Genese, who the government called to testify, spoke about "replica guns:"

Keene (cross-examination): "Do you recall the question you were asked in the grand jury, sir… were you asked – if you placed a replica handgun next to a real handgun, do you recall saying 'if you placed a legitimate firearm on a table next to this firearm that was recovered (not from Mr. Espinola) you could hardly tell the difference,' do you recall saying that?

Genese: Yes. *United States v. Espinola*, Jury Trial Day 9 p. 72.

As aforementioned, Mr. Espinola objects to any sentence enhancement based on his alleged possession of "an item" never definitively identified or presented as a firearm[2] in the statutory sense: "The pertinent federal definition of a firearm is more expansive than the Massachusetts definition. It includes 'any weapon ... which ... is designed ... to expel a projectile by the action of an explosive.'" 18 U.S.C. § 921(a)(3); *U.S. v. Alston* 112 F.3d 32 C.A.1 (Mass.),1997. Nothing at trial was offered to indicate that Mr. Espinola, even in a light most favorable to the prosecution, ever possessed any such item. Other cases are helpful: in *U.S. v. Kirvan*, 997 F.2d 963 C.A.1 (Mass.),1993 citing *U.S. v. Gonzalez,* 800 F.2d 895, 899 (9th Cir.1986) it was held that "the firearm statute…provides in relevant part that whoever carries a firearm during the commission of a crime [of violence] shall be sentenced… It is common ground that the gun need not be proved to be loaded or operable in order to convict, ***but that a toy or replica will not do.*** *U.S. v. Westerdahl,* 945 F.2d 1083, 1088 (9th Cir.1991) (Emp. Ad.).

---

[2] Mr. Espinola rejects as a mischaracterization so much of Paragraph 188 of the Presentence Report that alludes to a gun.

## D. PARITY AND PROPORTIONATE SENTENCING

Despite the draconian penalties urged by the Government, and at the time of this writing, Mr. Espinola's co-defendants received the following incarcerative terms as part of their aggregate sentences. (All but Espinola and Allen pleaded guilty to their respective charges.)

1. Jose Melo: *63 Months*.
2. Joseph Baldassano: *75 Months* (with 5K1.1 45% reduction).
3. Matthew Cream: *33 Months*.
4. Jason Matthews: *36 Months*.
5. Joseph Allen: *Awaiting sentencing after trial.*
6. Keith Behsman: *63 Months*.
7. Jonathan Mitchell: *Awaiting sentencing*.
8. James Gardner: *33 Months*
9. Phillip Albert Jr.: *Awaiting sentencing*.
10. Jared Knowlton: *18 Months*.
11. Archibald Macleod: *24 Months*.
12. Giuseppe Torrente: *2 Months*.

In each and every instance, and with every co-defendant, the Government sought the maximum term of incarceration, and the Court has consistently declined to adopt the Government's recommendation. Respectfully, Mr. Espinola requests the Court to reaffirm its rejection of the Government's position, and adopt the herein for sentencing.

## E. THE FUNCTION OF THE COURT

Perhaps the best statement of the function of judges in sentencing defendants in criminal cases was set forth by the Supreme Court in *United States v. Koon*, 518 U.S. 81

(1996): It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. 518 U.S. at 113. The individuality of each defendant and the uniqueness of each case were largely removed from the consideration of federal judges by the United States Sentencing Guidelines in 1987. A measure of discretion has been restored to the district courts in the ability to fashion a

sentence tailored to the unique circumstances of each case and the individual situation of each defendant by requiring sentencing judges to consider factors other than the sentencing range prescribed by the sentencing guidelines. Under 18 U.S.C. §3553(a), judges are required to sentence below the range if such a sentence would be sufficient to achieve the purposes of the statute. The guideline sentencing range is only one of five co equal factors to be considered in determining a sentence. *United States v. Booker*, 543 U.S. 220 (2005). The other four factors are (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparity; and (4) the need to provide restitution.

In light of *Booker*, the Guidelines are advisory, not mandatory. *United States v. Jimenez-Beltre*, 440 F. 3d 514 (1st Cir, *en banc* 2006). They maintain substantial but not controlling weight; and if there are clearly identified and persuasive reasons why the Court ought not to impose a sentence within the Guideline sentencing range, it ought to consider those reasons and impose a sentence accordingly. Id. at 516. *Booker* "makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." Id. at 518. Assuming that the district court correctly

calculates the guideline range and its reasoning is express or can be discerned, the remaining question ... is one of reasonableness ... Often, there can be more than one reasonable way of assessing a factor and more than one reasonable result. Assuming a plausible explanation and a defensible overall result, sentencing is the responsibility of the district court. *Jimenez-Beltre*, 440 F.3d at 519.

In the case at bar there is "a plausible explanation and a defensible overall result" Id., for the imposition of a sentence below the advisory Guideline sentencing range. In sentencing Mr. Espinola, the Court must proceed according to the three-step sequence endorsed by the First Circuit in *Jimenez-Beltre* at 518-19: (1) It must first determine the applicable Guideline sentencing range; (2) it must then consider and either accept or reject any proposed departures from that range; (3) and finally, it must determine "whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Id.

**F. THE GUIDELINE SENTENCING RANGE— (I) BASE OFFENSE LEVEL**

The quantity of OxyContin which the Court should find Mr. Espinola responsible for is 200 pills. In the almost year-long undercover operation in which the government was involved, and, in which numerous pill transactions were witnessed, videotaped, audiotaped, and otherwise observed, Carlos Espinola was never *specifically* included, nor was any currency or OxyContin recovered from him or his residence. Further, there were numerous DEA-6 Reports drafted in the course of this investigation, and only one referenced Mr. Espinola---as having driven to the Marblehead School of Ballet. Further, the government has conceded that Mr. Espinola actually ***abandoned*** the conspiracy via his entrance into a drug rehabilitation program; effectively curtailing his ability to continue with his allegedly illicit activities:

> [Mr. Pelgro] In June 2004, a new undercover agent named Glen Coletti will testify here before you. A deal was arranged for June 7th in which Baldassano would sell 100 OxyContin pills to Agent Coletti. There are three things that are of particular importance about that deal: **First, unbeknownst to DEA, Carlos Espinola had taken himself out of the picture by that time.** Baldassano will tell you that Espinola also used OxyContin just as much as anyone else in this case, and that prior to June 7th, 2004, Espinola stated that he was checking himself into a drug rehabilitation program and that Baldassano would get a call from somebody else to

> keep the flow of OxyContin pills going. Baldassano will tell you he got that call and that he began getting OxyContin pills from this new contact. By the time June 7th rolled around, Baldassano was getting pills from that contact's associate, a man named Joe Melo, who lived at 20 Tracy Street in Peabody. So, the supplier for this June 7th deal was Melo in place of Espinola, who was supposedly in a drug treatment program. *United States v. Espinola*, Jury Trial Day 2 p. 24. (Emphasis added)

Mr. Espinola agrees with the Government on two important points: (1) He *did* enter a drug rehabilitation program (actually two), and (2) he *did* take himself out of the picture. These two points are extremely relevant to Mr. Espinola's true role in this conspiracy, and ratifies or confirms the reason why he was never observed to have engaged in any illicit conduct by the DEA, nor ever recorded or present during the many drug transactions extensively detailed by the government: **For the majority of time within which these Oxycontin deals were occurring, Carlos Espinola was in detox.** In January, 2004 through February, 2004, Mr. Espinola was admitted to a detoxification program in Saugus, Massachusetts, and thus, it is inconceivable, if not impossible, that he was providing OxyContin to any person. He re-admitted himself for further treatment on April 20, 2004, this time to Cambridge Hospital where he was treated and released on April 28, 2004 with "prescriptions for 25 mg of Seroquel to be taken four times daily as needed for anxiety and 150 mg of Trileptal to be taken three times daily as a mood stabilizer." See: Presentence Report, pp. 50-51. In fact, during much of the investigation culminating in the arrest of Mr. Espinola and his co-defendants, he was desperately seeking medical treatment for various addictions and psychiatric disorders, and was *incapable* of any illicit activity. If the Government is to be believed in its characterization of a "handoff" [from Mr. Espinola to Joe Melo and/or others] then let said "handoff" accurately reflect the actual time period: **in January, 2004, not June**. If this logic is followed to its ultimate conclusion, and, as the Government asserts---if there *were* new parties supplanting Mr. Espinola (as it contends) and that Carlos Espinola "had taken himself out of the picture by that time" let "that time" i.e. *the accurate date* be January, not June. Thus Mr. Espinola, who was characterized as a "major supplier" and "sole supplier," for the purposes of pill quantity, was *minimally* involved. While the Government's protest and objection of this logical argument is expected, (especially in light of its nearly two-year long *mantra* in which it championed Mr. Espinola as "the

kingpin" and "at the top of the drug distribution chain") it certainly **explains his *non-involvement***: the 50-plus state and federal agents, conducting round-the-clock surveillance of him, his residence, and his co-defendants for nearly a year, never once issued an incriminating report on him. Further, in the hundreds and hundreds of hours of audiotapes and videotapes, Mr. Espinola is never heard and he is never seen. Of the sixteen controlled drug transactions as observed by the police, he was, arguably, peripherally involved in only two: On December 2, 2003, following a meeting at the Bugaboo Creek in Peabody, Massachusetts, in which 100 OxyContin pills were exchanged between Behsman, Baldassano and Knowlton, Baldassano and Knowlton later entered Mr. Espinola's residence. On December 12, 2003, Mitchell and Behsman conducted a 100 pill OxyContin transaction with undercover agents in Gloucester, Massachusetts. After a brief stop at his residence, Mitchell drove to Mr. Espinola's house in Peabody, Massachusetts. For the duration of the investigation, this was the extent of Mr. Espinola's involvement. No other co-defendant ever visited his house again, coupled with the fact that Mr. Espinola *was never* witnessed in public with his co-defendants while his co-defendants were engaged in illegal activities. Mr. Espinola was "out of the game" [as the Government so aptly described] but not in June, as the Government erroneously mischaracterizes the date, but if he ever "were in the game" he was "out" by January, 2004.

Furthermore, were he the "kingpin" which the government repeatedly contends he is, his hospitalizations would have rendered him unable to supply his highly addicted customers, necessitating that they find an immediate, substitute supply elsewhere. (In the vernacular, "junkies" aren't going to stand-by and patiently wait for their supplier to be released from the hospital so as to obtain their daily "fix." Due to the onset of severe physical withdrawal symptoms, they are going to accommodate their "jones/cravings" by seeking Oxycontin elsewhere.) This again bolsters Mr. Espinola's contention that whatever activity the government alleges involved Mr. Espinola, it stopped shortly after the Christmas season when he became largely unavailable and inaccessible.

*The Base Offense Level is as follows:* 200 80 milligram Oxycontin pills x 0.08 per pill x 6700 / 1000. Pursuant to U.S.S.G. § 2D1.1, this equilibrates to 107.2 kilograms of marijuana,

resulting in a BASE OFFENSE LEVEL OF: **26**
(63-78 month term of incarceration)

## II. ADJUSTMENT FOR ROLE IN THE OFFENSE

Despite the Government's many assertions, Mr. Espinola avers if the Court adopts the Base Offense Level of 200 pills, that he is a candidate for Minimal Participant Status. Pursuant to U.S.S.G. § 3B1.2 he qualifies for and is entitled to a 4 point reduction in his base offense level for his role in the offense. The Defendant was arguably implicated in only two of sixteen controlled purchases in a ten month operation. In the first controlled buy, he was visited by members of the buy, who came to his residence. In the second controlled by, the same scenario unfolded. The commentary to U.S.S.G. § 3B1.2 Application Notes: 3. Applicability of Adjustment: A. Substantially Less Culpable than Average Participant/Supplier (*such as Baldassano and Melo and [DeSilva] and Behsman*) is directly on point with this circumstance in which a person who is charged with drug trafficking in a conspiracy and is only being held responsible for the weight he actually transported or stored is not precluded from receiving this adjustment, especially when his role is a small role such as in the instant matter, *receiving drug transaction participants into his home shortly after the buys had been concluded.*

Mr. Espinola's minimal involvement is substantially buttressed not only by the Government's assertion that "he had taken himself out of the game" [in January, not June, 2004], but also that he is never mentioned at all, in any DEA reports relating to the other fourteen controlled drug buys. In actuality, he had disappeared from the scene.

| | | |
|---|---|---|
| *The Base Offense Level is as follows:* | 200 80 milligram Oxycontin pills x 0.08 per pill x 6700 / 1000. Pursuant to U.S.S.G. § 2D1.1, this equilibrates to 107.2 kilograms of marijuana, resulting in a BASE OFFENSE LEVEL OF: **26** (63-78 month term of incarceration) | |
| *Adjustment for Role in the Offense:* | 26-4 (41-51 month term of incarceration) | **22** |

## III. OTHER FACTORS UNDER 18 U.S.C. §3553

18 U.S.C. §3553 requires that a court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The sentencing judge is statutorily prohibited from imposing a sentence on a criminal defendant that is greater than necessary according to the statute, even when a greater sentence is indicated by the sentencing guidelines. *United States v. Denardi*, 892 F.2d 269, 276-277 (3d Cir. 1989). In

light of the aforesaid, Mr. Espinola respectfully requests the Court to consider the following in imposing his sentence: Mr. Espinola has no criminal history, has never been arrested, nor faced a term of incarceration or been confined (excepting the instant case) at any other point in his life. It is noteworthy that, even before his arrest, he was making great strides to address his addictions and mental disabilities---not as a "pre-sentence recovery effort" which is compelling in and of itself, but as a recovery effort of his own volition, while he was unaware of the pending indictment and case against him and twelve others. Whatever life he led prior to January, 2004, he sought to better through his riddance of chemical dependency and emotional turmoil. His efforts were in large part successful, and he reported to his Probation Officer that "he currently 'feels great; he is no longer taking his previously prescribed medication, and sees no need for mental health treatment." See: Presentence Report, Paragraph 189.

Additionally, the sentences already imposed on the majority of the defendants in this case suggests that the Court should depart downward and adopt Mr. Espinola's recommendation. It is no secret that Mr. Baldassano was, irrespective of what level of credibility one might ascribe to him (if any), a highly manipulative, college educated, career criminal, who boasted that "everything (drugs) that comes through Gloucester comes through me. His manipulation of "the system" began well-before he was arrested, and he has sold drugs and addicted many, many persons, for years. He then began his manipulation of the court system as soon as handcuffs were placed upon him in the instant case, and he has dutifully worked his government handlers and prosecutors to position himself in the best light possible---at the expense of, among numerous others, even his closest childhood friend.

Conversely, Mr. Espinola resisted the inherent benefits not only of coercive pleading known as "Acceptance of Responsibility" and the "Safety Valve" but also the Government's repeated invitation that he cooperate. He withstood the rigors of trial, and listened to every scabrous accusation leveled at him by the Government's endless cavalcade of self-motivated and/or formerly and/or currently drug addled witnesses.

## IV. CONCLUSION

Mr. Espinola was born on January 5, 1977 in Azores, Portugal, and is the only child born to the union of Francisco an Idalia Espinola. He enjoyed a healthy, normal childhood and became a naturalized American citizen on November 19, 1987. He lives in a three-family house in Peabody, Massachusetts with his mother and father, and, notwithstanding the instant matter, looks after their needs as they age. He is a high school graduate with specialized training as an electrician. As the numerous attached character reference letters attest, by all accounts Mr. Espinola was,

and is, a highly regarded member of his community, to which he looks forward to returning upon his release from prison. He has numerous employment skills and, as aforesaid, is a competent electrician.

Given his utter lack of criminal history, his independent efforts at sobriety prior to his arrest, and the likelihood that upon his release he is most unlikely to reoffend, it seems suitably appropriate for the Court to order a term of incarceration of 41 months, three years supervised release, no fine, and a special assessment of $200.00

Respectfully submitted
CARLOS ESPINOLA
By his attorney,

/s/ **Bradford Eliot Keene**

Bradford Eliot Keene
BBO# 629440
Keene & Gizzi, P.C.
220 Broadway
Suite 402
Lynnfield, MA 01940
BKMOGUL@aol.com

August 1, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing System on August 1, 2006.

/s/ **Bradford Eliot Keene**
Bradford Eliot Keene

Timothy Hayes Electrical Contracting

June 14, 2006

Re: Personal Reference for Carlos Espinola

To Whom It May Concern,

My name is Timothy Hayes. I am an electrical contractor who has employed Carlos Espinola on a regular basis from April of 2005 until the start of his court case last month. While I cannot speak to the case, I would like to relate my experience with Carlos as a worker and a friend over the past year.

Throughout my experience with Carlos he has proven to be dependable, hard-working, responsible and trustworthy. Carlos possesses a willingness to learn, a commitment to performing his job professionally, and a strong sense of teamwork. At no time has Carlos been anything but respectful, courteous, and professional in his dealings with me, his co-workers, or my customers. Over the past year I have come to rely on Carlos as a good worker whom I would not hesitate to hire in the future should the opportunity arise.

I thank you for your consideration.

Respectfully,

Timothy J. Hayes

Timothy J. Hayes
Timothy Hayes Electrical Contracting
32 Middlesex Avenue
Swampscott, MA 01907

**Our lady of help**
**63 Northend St.**
**Peabody, Ma. 01960**
**978-532-3093**

Signatures of members

128

# Sociedade Portuguesa de Beneficencia de Nossa Senhora d'Ajuda

Organizada a 15 de Agosto de 1904, e Incorporada a 9 de Maio de 1910.

SÉDE EM PEABODY, MASSACHUSETTS.

Eu Carlos Miguel Espinola Estado solteiro idade 17 anos (data do nascimento 5 Janeiro 77) Ocupação ——
Natural de Terceira Azores Filho, Filha de Francisco Espinola
e de Idalia Espinola e agora residente na rua 63 Endicott St. No. 63
Cidade Peabody Estado MASS Desejando ser Sócio da Sociedade Portuguesa de Beneficência de Nossa Senhora d'Ajuda, em Peabody, Mass. Declaro que estou de perfeita saúde e não sou sujeito a doenças frequentes de espécie alguma. Declaro mais que me submeterei ás leis e regulamentos d'esta associação, e nunca revelarei os seus trabalhos, e declaro mais e afirmo sob minha palavra de honra que são verdadeiras todas as minhas informações apresentadas nesta proposta, e quando se ache serem falsas as minha afirmações, ficarão nulos todos os meus direitos embora mesmo que tenha pago alguns assessments.

Tambem declaro que constituo por meus legítimos herdeiros, e ordeno que a quantia determinada do Fundo Mortuário, seja paga por minha morte ao Sr. Francisco Espinola
Relação casado Residente 63 Endicott St

Em testemunho da verdade me assino hoje aos 26 dias de Janeiro ano de 19 94.

Assinatura do aplicante Carlos Espinola

Proposto por [signature]

REFERENCIAS: José B. Mendonça
Luis A. Rodrigues

Pertence a mais alguma associação ou seguro? Não Quais? ——
Já foi membro desta associação? não Porque deixou —— Foi rejeitado? não
Motivo —— Tenciona a entrar com fins próprios e dignos de membro desta associação? ...................... Procura afiliar-se connosco com interesses particulares? não Responsabilisa-se a tomar quaisquer obrigações para o bem-estar moral desta associação, uma vez que não vai contrario aos seus deveres pessoais.

## COMISSÃO INVESTIGADORA

Nós abaixo assinados tendo cuidadosamente investigado o carácter moral e físico do aplicante ................................................ certificamos que de acôrdo com as leis e regulamentos previstos na Sec. 5 do Capítulo II, achamos o aplicante em condições de .............. ser admitido membro desta associação. E por ser verdade nos assinamos hoje aos .............. dias de ........................ ano de 19 ........ em Peabody, Massachusetts.

ASSINATURAS:
..............................................
..............................................
..............................................

# MEDICAL EXAMINATION

What long or serious sickness have you ever had? ..no..............................

Where and when? .......no..............................

When, where and with what were you last sick? ...no..............................

Have either of your parents or any brothers or sisters died of consumption? ..no..............................

Have you ever had any of the following diseases: Applexy, Appendicitis, Asthma, Bronchitis, Cancer or other tumor, Consumptino, Diabets, Disease of the Brain, Heart, Kidneys, Liver, Lungs, Urinary organs, Dropsy, Fistula, Fits, or Convulsion, General debility Habitual cough, Hemorriage, Intestinal or hepetic colic, Pleurisy, Pneumonia, Rheumatism, Spinal disease or spitting or raising blood, Ulcer or open sores.

If so, state particulars ..no..............................

..............................

..............................

..............................

Have you ever been treated for any disease not mentioned above? no ..............................

Have you ever been rejected by any insurance or Society? ..no..............................

**To Female Applicants — Regularity and Character**

Has Menopause occurred? ........ Breast any present or previous disease? ..............................

Is the applicant now Pregnant? ........ How many children have you had? ..............................

If any died, state cause ..............................

I declare that I have truthfully answered all questions to the best of my knowledge, and agree that any misstatement shall render all obligation of the Portuguese Benefit Society of Our Lady of Help, Peabody, Mass. void to be my heirs and assigns.

.............................. Applicant.

## MEDICAL CERTIFICATE

A careful examination of the heart, lungs, and Urine is required in every instance.

Examination of the heart: Is there anything discovered by you either hereditary or aquired to any heart disease? ..no..............................

Examination of the Lungs: Is there anything discovered by you either hereditary or aquired to pulmonary disease? ......no..............................

Examination of the Urine: Urinalisis gravity ..1.010.. Albumin ..0..... Sugar ...0..... Reaction, acid or alkaline? ...PH 5.5.....

I certify that I have carefully examined the applicant named herein and that the above is a correct description of ........ physical condition and do hereby recommend ........ as ..✓... fit to become a member of the Portuguese Benefit Society of Our Lady of Help, Peabody, Massachusetts.

.............................. Witness.

.......K Jackson, MD....... Examining Physician.

Sociedade Portuguesa de Beneficencia de Nossa Senhora D'Ajuda, Peabody, Mass., ao ............ dias de ................ ano de 19..... foi admitido membro desta associação o sr. .............................. residente na rua .............................. No........ Cidade .............. .................. Estado ..............................

SHARON L HALL
265 DEN QUARRY RD
LYNN MA 01904-1340

June 8, 2006

To Whom It May Concern:

This is a Letter of Reference for Carlos Espinola.

Even though I have known Carlos for only six months, he has demonstrated to be a hardworking and responsible individual. I have seen nothing but positive actions on his part. His love for children goes unnoticed, especially when he takes the time for them and plays ball with them at birthday parties for hours on end.

I remember back when my husband and I had attended a Portuguese Feast and Carlos had helped out tremendously with all the cooking, serving and cleaning for the elderly.

Carlos has even been a great deal of help to my husband and I with household problems we had. Without hesitation he was there in time of need. Carlos is not only a great guy, but also a friendly, kind, loving, respectful and helpful young man.

Sincerely,

Sharon L. Hall

Sharon L. Hall

KENNETH D. HALL
265 DEN QUARRY RD
LYNN MA 01904-1340

June 8, 2006

To Whom It May Concern:

This is a Letter of Reference for Carlos Espinosa.

Carlos has been a friend of mine for the past year or so. Carlos and I have worked together Birthday Parties for kids and adults and at a Portuguese Festival. He is a hard worker. If he can help you, he would without hesitation.

He has without hesitation been there for me and my family to help out with projects for our home. He has shown me to be a reliable friend. Carlos is a man of his word and that is hard to find these days.

I am proud to have such a good and loyal friend.

Sincerely,

Kenneth D. Hall

PROB 14D
(3/64)

UNITED STATES DISTRICT COURT
FEDERAL PROBATION SYSTEM

# REQUEST FOR EMPLOYMENT DATA

DATE: June 2, 2006

Dear Sir;
The person identified below is under investigation by this office. The information requested is needed to complete this investigation. Your cooperation will be greatly appreciated.

Please return this form within three days in the enclosed envelope. No postage is necessary.

SIGNATURE OF PROBATION OFFICER
Tricia Marcy

ADDRESS OF PROBATION OFFICE
**1 Courthouse Way, Suite 1200**
**Boston, MA 02210**

**PHONE NO.** (617) 748-4200

FAX: (617) 748-9185

Fat Boy Cycles
Attn: Personnel
11 Caller Street
Peabody, MA 01960

**NAME OF PERSON BEING INVESTIGATED (Last,First,M.)**
ESPINOSA, Carlos

**ADDRESS OF PERSON BEING INVESTIGATED**
63 Endicott St.
Peabody, MA 01960

| DATE OF BIRTH | PLACE OF BIRTH | SEX | RACE |
|---|---|---|---|
| 01/05/77 | Portugal | Male | White |

SOCIAL SECURITY NUMBER
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

Subject reports he was employed from 4/04 - 6/04. Please verify below. Thank you.

INFORMATION DESIRED

| WAS THIS PERSON EVER IN YOUR EMPLOY? | IF "YES" GIVE DATE STARTED | DATE LEFT | SALARY OR WAGE |
|---|---|---|---|
| [ ] YES [ ] NO Helped out | 4/04 ? | 6/04 ? | To work off bill! |

POSITIONS HELD: Helper in shop - Body work ect!

REASON FOR TERMINATING EMPLOYMENT
He Help here in the shop for about 8 weeks to pay off a parts bill he had! He had no cash to pay his bill!

WAS THIS PERSON'S SALARY ATTACHED?
[ ] YES [ ] NO ? Barter

WOULD YOU CONSIDER REEMPLOYING THIS PERSON?
[ ] YES [ ] NO ? Not needed

REMARKS (Concerning this person's attendance, ability, industry, reliability, and different times employed by your organization.)
Good worker - he was reliable + did what he said he could do.

| SIGNATURE OF EMPLOYER | TITLE | DATE |
|---|---|---|
| [signature] | Owner | 6/8/06 |

IF ADDITIONAL SPACE IS REQUIRED, USE REVERSE SIDE

To Whom It May Concern:

Thursday, July 27, 2006

This letter is in support of Carlos Espinola. I have known Carlos and his family, Mr. and Mrs. Francisco Espinola, for along time. Through my participation in the choir at our church, in which they also participate, I have come to know them pretty well.

The Espinolas are a typical immigrant family who came to this country full of optimism and determined to make a decent life for themselves. Through honest hard work they succeeded in making themselves contributing citizens of our community. I would consider them solid upstanding citizens. They raised their son, Carlos, to be a good citizen and a good human being. I would consider Mr. and Mrs. Espinola model parents

As a teenager Carlos was a good kid and never had any problems with the law or with other kids in the neighborhood. For the people in this neighborhood who know Carlos and his parents, his recent run-in with the law came as stunning shock. His parents are profoundly devastated by this.

Because this is his first offense, I would beg the court to be lenient and give him a chance to redeem himself.

Sincerely,

Dr. Milton M. da Silva, Ph.D

7/7/06

I. Ezequiel da silva who resides at 31 quail rd, peabody mass have known

Carlos   Espinola since he   was twelve years old , I was his guitarist instructor
for about five years .  Carlos is a great motivated individual with great talent

for music.  Carlos was always a good listener. I truly sympathize for him,

knowing that he was a great child growing up.


thank you,

Ezequiel D. da Silva

Office (978)532-5138
Fax (978)532-2419

**Pereira Realty Trust**
Rental & Investments
P.O.Box 614
Peabody, Ma 01960

Date July 28, 2006

Re: Carlos Espanola
63 Endicott St
Peabody, Ma 01960

To Whom It May Concern:
Mr. Espanola has been a loyal and dedicated friend to me in our Teen hood and up till now, Mr. Espanola has shone me his trust and that he is responsive, because he is part time employed by me in the winter as a equipment operator in my eight snow & ice control and safety truck equipment contracted by the Mass, Highway of snow and ice control and safety. Mr. Espanola has shone me in the last three years that he is capable and responsible to trust him as a operator in one of my equipment for hire by the Mass Highway of snow & ice control and safety and that I can depend on him as a operator at any time of the day or night and holidays to be part of my crew of the Mass Highway of snow & ice control and safety convoy snow fighting crew. This is the type of job that I depend on responsible equipment operators in this type of work. In the winter seasons.

If you have any questions in regarding this matter please feel free to call me
Thank you

Sensirly yours

Robert Pereira trustee

Connie Alves
76 NorthEnd Street
Peabody, MA. 01960
978-771-5140

June 29, 2006

Re: Carlos Espinosa

To Whom It May Concern:

It is with great pleasure that I write regarding Mr. Espinosa's character. I have known Carlos for the past several years. I have worked along side him during many events for the Portuguese and Peabody community. Carlos himself has organized many of these events, such as charity events for Juvenile Diabetes and the American Cancer Society. I have found him to be relentless when working for any event He is well liked and respected by this community for his selfless efforts with helping the children and elders alike he is sorely missed at this time. I myself am a better person for knowing him.

Best regards,

Connie Alves

TO WHOM IT MAY CONCERN,

I have known Carlos Espinola for most of my life. During this time I have never met a person that did not like him or respect him. Carlos is everyones  friend from little kids to elderly people, and his huge heart earned his place in my family.

Carlos is known to my kids as uncle Carlos and yet There is no relation. He has been like a brother to me, closer than any of my own brothers. He has been a role model for my kids , always trying to give them advise but maintaining that trust with them so they would continue to tell him their problems.

I have never known Carlos to have a problem with the law before and it is my understanding that this is his first offense. I could only hope for the court to take this in consideration when handing Carlos Espinola his sentence.

Carlos Espinola is a good person who comes from a good family and does contribute to the lives of his parents financially. Working everyday Carlos would give his parents his pay at the end of the week taking only what he needed for himself so they could pay bills. He is not a selfish person and in my opinion would do society better outside of jail than inside .

I thank you for this opportunity to write on his behalf and can only hope you grant him a safe return, and take in the importance of Carlos being home helping his family and putting this nightmare behind him. If you have any further questions please do not hesitate to call me Julio Cunha @978-535-1391 thank you.

Thank you
Julio Cunha

To whom it may concern,

I have known Carlos Espinola for about eighteen years. During this time Carlos has been a great friend to me. He has always been there when I needed him for my self personally or something with the family.

Carlos is loved in his community for the type of person he is. He is loving, caring, and compassionate. He helps everyone who needs or asks him for a hand. Whether Carlos knows you for a day or a thousand years Carlos is the best friend he can by giving you everything he has heart and soul.

My wish is that you see Carlos for the loving person he is, and take consideration his otherwise clean record and give Carlos another chance to redeem himself. I know given this chance he would not let you down and at no surprise to me prove his spot in his community.

To my Kids he is Uncle Carlos and for this I am grateful because there is no other person I would rather trust my family with. He has proven to be time and time again better family than a blood relative, never breaking a promise and always being there when you need him, and for this reason he has earned my love and the love of my family.

Do not hesitate to contact me on this matter for any reason @ 978-535-1391

Thank You
Maria Cunha

Maria Cunha

Our lady of help
6§ Northend St.
Peabody,Ma.01960
978-532-3093

To whom it may concern, 7/28/2006

Carlos Espinola has been a valued member of this organization for twelve years. He always helping when called upon. He donates his time at this organization by either helping clean up after functions, repairs on the building,or even gives his time to work within the hall for weeks at a time.

Carlos Espinola comes from a good family, and is a good person. He loves to interact with children and is always compationate with the elderly. It is our wish to see carlos reenter his place in this community as soon as possible, because he truly is an asset to this community .

Thank you for taking the time to review this letter and if you have any questions please do not hesitate to contact us.

President [signature]

V. president [signature]

Maria C. Branquinho
34 Mt. Vernon Street
Peabody, MA 01960

June 9, 2006

To whom it may concern,

I am writing on behalf of Carols Miguel Espinola. I first met Carlos when he was eight years old. He was a big blue-eye little boy eager to learn. At the time, my father was forming a community group for children of Portuguese heritage. Carlos was one of the first children accepted to this organization called Grupo Etnografico Portugal dos Pequeninos, Inc. a non-profit organization dedicated to the teaching of Portuguese traditions through songs and dances.

We met every Friday and practiced the songs and dances and performed at various cultural festivals throughout New England, Canada, the State House and the Azores. Carlos was a member from the age of 8 until the age of 14. It did not take long to see his musical ability and his dancing ability. He soon became one of the "leaders" in the group. He would be the first one to learn the dances and the songs and would help me explaining them to the rest of the group, especially the ones who had a harder time learning them. The smaller kids looked up to him.

My father always had a soft spot for Carlos and has a result, when my father passed away last April, I asked Carlos to be one of his pallbearers. I know my father would have liked that. Carlos is an extremely bright and talented person. He has done a lot for his community.

Sincerely.

Maria C. Branquinho

Maria C. Branquinho

July 1, 2006

MARIA J GIL
President
Tremont Market Inc
70 Tremont ST
Peabody MA 01960

To whom it may concern.

I have known Carlos since he came to this country. As far as I am concerned he is a good person and comes from a good hard working family.

Thank you,

Maria J Gil

MARIA J GIL

*Trackside Bar & Grill*

*30 Warren Street*
*Peabody, MA 01852*
*Tel# 978-531-1047 * Fax# 978-458-1587*

June 29, 2006

RE:    Carlos Espinola

To whom it may concern,

I have known Carlos Espinola for over 20 years.  He is an only child.  I have always known Carlos to be respectful to others.  He is very family oriented. I own a Bar & Grill in Peabody, MA for a year now and Carlos has been a very good customer of mine for the past year.  He always came in and minded his own business and never caused any problems.  He is always very friendly with my staff and my customers.  I am very glad to know him not just as a person, but also as a friend.

Sincerely,

John Bettencourt
Owner

June 19, 2006

Dear Sir or Madam:

I was first introduced to Carlos Espinola when he was just a little boy. I have watched him grow from a little boy to a fine young man. Carlos has always been there to help and support his family and friends. He has been involved in a lot of community activities having to do with his heritage since he was very young. Carlos is always willing to lend a helping hand and be supportive at anytime during any situation. Even though we are not related, we have become just as close as family. I am proud of Carlos and his accomplishments. It is always a pleasure to see him at family and friend's gatherings, especially when he takes time from the "adult world" to entertain his younger cousins. Carlos is a gentleman with a kind heart!

Sincerely,

[signature]

Noreen Galopim
30 Baldwin Street
Peabody, Mass. 01960

June 14, 2006

To whom it may concern,

As Music Director of Our Lady of Fatima Parish, I have had the opportunity of working with Carlos Espinola in many of our celebrations during the past twenty years. Through the years, he was always willing to assist us with the church hall functions at a moments notice. His enthusiasm and overall emotions were plain to see when he played the guitar we all knew he was helping out a good cause.

He's also a hard working individual as I've used his services in our business properties.

If additional information is needed, please do not hesitate to call me at (978) 531-2304.

Sincerely,

Noreen Galopim

Noreen Galopim/Choir Director

June 7, 2006

To Whom It May Concern:

It is with pleasure that I write this letter of reference for Carlos Espinola. I have known Carlos ever since he was a youngster in our community. My daughter, brother and Carlos were members of Grupo Etnografico dos Pequeninos, a dance group that taught children Portuguese dances, heritage and culture. Carlos was always an excellent student and very proud of his ethnic background.

I have also known Carlos from church; as he attended church with his parents and I had the pleasure of witnessing him receive his sacraments at our church.

Carlos was always eager to participate in community events, such as playing the guitar for the Portuguese Carnival dances every February. In order for these dances to be successful, it required endless hours of rehearsal week after week and Carlos was always eager and happy to participate.

Carlos has a genuine heart and was always willing to assist the community, The Holy Ghost, Our Lady of Help Hall, The Club of Luis de Camoes and other Portuguese associations. He was always happy to devote his time to assist the community.

Carlos has been an asset to those of us who have been fortunate enough to see him, as he is, a caring and thoughtful young man.

Sincerely,

Maria Machado

Maria Machado
14 Albion Street
Salem, MA 01970

To Whom it may concern.

My name is Elio Vasconcelos, and I've Known Carlos Espinola since November of 1987 over 18 years ago.

Since then, we have become friends, Best friends to the point where he asked me to become his Confirmation godfather.

Being his godfather gave me a chance to get to Know him on a personal level, and find out how much he cares for others.

When my wife Susy, from Toronto Canada, moved to the United States, Carlos Espinola was very friendly and made her feel Right at home.

"He always volunteered to help us out and even he gave my wife Susy a Ride to her first job interview" where she is still working after 11 years.

Now that we have two daughters, he continues to be the same Caring guy towards our family, and he has been like a Big brother to our grils.

Carlos Espinola is a big part of Our Family.

Sincerly

Elio F. Vasconcelos

The Vasconcelos
9 Granite Road
Peabody, MA 01960