UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
**UNITED STATES OF AMERICA**       )
                                   )
         v.                        )    Crim. No. 04-10288
                                   )
**CARLOS ESPINOLA**                )
_____)

### SENTENCING MEMORANDUM OF THE UNITED STATES

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorneys David G. Tobin and Michael J. Pelgro, hereby files a sentencing memorandum in the above-referenced case for the use of the Court in determining an appropriate sentence for Carlos Espinola (Espinola).

### Background

On June 30, 2004, Espinola was arrested pursuant to a warrant issued by United States Magistrate Judge Charles B. Swartwood.  Espinola appeared before Magistrate Judge Swartwood on the same day and was temporarily detained.  On July 12 and 13 2004, a detention hearing was held before Magistrate Judge Swartwood the matter of detention was taken under advisement.  On July 16, 2004,  Magistrate Judge Swartwood issued his Memorandum of Probable Cause and Order of Detention.  [See docket entry 54.] Magistrate Judge Swartwood found Espinola to be a danger and ordered him detained.  On September 22, 2004, a federal grand jury in Boston, Massachusetts handed down an indictment which charged Espinola with conspiracy to possess with intent to

distribute, and to distribute, oxycodone in violation of 21 U.S.C. § 846 (Count One).  [See docket entry 90.]  Twelve other defendants also were charged in the indictment.  On December 20, 2004, the Court, over the objection of the United States, revoked Espinola's Order of Detention and released Espinola on conditions of release.  [See docket entry 136.]  On March 2, 2005, Espinola tested positive for the use of cocaine.  On May 22, 2006, after an eleven day jury trial, Espinola was convicted and the Court ordered Espinola into custody.  Espinola's sentencing is scheduled for August 15, 2006.

## **Presentence Report**

In its initial Presentence Report, U.S. Probation determined that Espinola should be held responsible for 4,800 eighty milligram OxyContin tablets, which corresponded to a Base Offense Level (BOL) of 32.  [See Presentence Report paragraph 156.]  U.S. Probation devised the tablet quantity by taking the number of eighty milligram OxyContin tablets for which the Court had held Joseph Baldassano responsible (3,100) and subtracting 700 tablets to account for tablets Baldassano received from Espinola's supplier as well as from co-defendant Jose Melo.  To the resulting 2,400 tablets, U.S. Probation added 2,400 tablets based on Ryan Caverly's testimony that Espinola supplied him with at least 100 tablets each week for two years.

Pursuant to U.S.S.G. § 2D1.1(b)(1) U.S. Probation increased Espinola's offense level by two levels because of Espinola's

possession and use of a firearm. The two level increase resulted in a Total Offense Level (TOL) of 34. With a TOL of 34 and a Criminal History Category (CHC) of I, Espinola's Guideline Sentencing Range (GSR) was determined by U.S. Probation to be 151 months to 188 months.

In its objections to the Espinola Presentence Report, the United States argued that based on the trial testimony of Baldassano, Caverly and Michelle Dawicki, Espinola should be held responsible for 20,330 eighty milligram OxyContin tablets and his corresponding BOL should be 36. In its Revised Presentence Report, U.S. Probation acknowledged it had "difficulty in determining a drug weight for which [Espinola] should be held accountable. While emphasizing that the 4,800 tablet quantity was a "very conservative" determination, U.S. Probation noted that it was not present at Espinola's trial and was "not in a position to evaluate Baldassano's credibility." Ultimately, U.S. Probation left it to the Court to determine the number of OxyContin tablets for which Espinola is responsible.

U.S. Probation noted that if the Court adopted the government's recommendation on the number of eighty milligram OxyContin tablets for which to hold Espinola accountable, his TOL would be 38 (BOL of 36 + 2 level increase for the use of a firearm = TOL of 38) and his GSR would be 235 to 240 months (the statutory maximum).

**Oxycodone Amount Attributable To Espinola**

The United States believes that Espinola should be held responsible for at least 20,300 eighty milligram OxyContin tablets. As noted previously, this would result in a BOL of 36.

U.S. Probation started its drug quantity calculations "with the total weight of oxycodone that was attributed to Baldassano" by the Court and then added the OxyContin attributed to Espinola by Ryan Caverly. The United States respectfully submits that this was an incorrect method to use to determine the amount of oxycodone attributable to the defendant. As the Court noted at Baldassano's sentencing hearing, the Court did not consider Baldassano's trial testimony when calculating the amount of OxyContin attributable to Baldassano because he testified pursuant to a plea agreement wherein the government agreed not to us his statements against him. This limitation on the use of Baldassano's trial testimony does not apply to Espinola's sentencing.

U.S. Probation noted in the Revised Presentence Report that it did not attend the trial and could not assess the credibility of Baldassano. As a result, U.S. Probation left it to the Court to determine Baldassano's credibility and the total number of eighty milligram OxyContin tablets for which Espinola should be held accountable. The United States respectfully submits that the jury had ample opportunity to assess Baldassano's credibility when he testified at the trial over a three day period and found

him credible. Furthermore, during a sidebar conference at Espinola's trial, the Court noted on the record that it found Baldassano's trial testimony substantially credible. Baldassano's trial testimony concerning Espinola's OxyContin distribution was corroborated by the trial testimony of Ryan Caverly, Michelle Dawicki, Kevin Teixeira, Steven Aptt, and Tom Prendergast.

<u>Baldassano's Testimony</u>

Baldassano testified that in May or June 2002, Tony Avellis (Avellis), an individual who had been providing Baldassano with OxyContin, took Baldassano to Peabody to meet the person from whom Avellis had been obtaining the OxyContin. Avellis drove Baldassano to 63 Endicott Street in Peabody and introduced him to Espinola, who lived in a third-floor apartment. During this meeting, Baldassano stated that he wanted to become a frequent customer for both OxyContin and ketamine as there was a demand for both in Gloucester. Espinola agreed to supply both and he exchanged cellular telephone numbers with Baldassano. Espinola was charging $15 per OxyContin pill (20-milligram). At this meeting, Baldassano obtained 30-50 20-milligram OxyContin pills. Baldassano sold these pills in Gloucester.

Approximately one week later, Baldassano returned to 63 Endicott Street and obtained another 30-50 20-milligram OxyContin pills from Espinola. Baldassano sold these pills in Gloucester. For approximately one month, Baldassano obtained that quantity of

pills about once a week as he attempted to build his business and obtain customers. After that, "it became anywhere from two to four times a week" that he obtained 30-50 20-milligram OxyContin pills from Espinola. Baldassano put the word out in Gloucester that he had twenty milligram OxyContin pills and he sold them out of co-defendant Jason Matthews's residence or at different locations in Gloucester.

After about a month, Espinola stated that he could get eighty milligram OxyContin pills. Baldassano agreed to purchase them from Espinola. After that, Baldassano obtained only eighty milligram pills from Espinola and never returned to the twenty milligram pills. After Baldassano first started selling the eighty milligram pills, business was slow. In the beginning (summer of 2002), Baldassano obtained 50 eighty milligram OxyContin pills at a time from Espinola. As business picked up during the summer of 2002, Baldassano began obtaining greater quantities of pills from Espinola. He then obtained 100 to 250 eighty milligram OxyContin pills "between two and four times a week" from Espinola throughout the remainder of the conspiracy. Espinola charged Baldassano $52 per pill and Baldassano was charging his customers $60 per pill. As business progressed, Baldassano would sell individual OxyContin pills for $80 per pill. Espinola continued to supply Baldassano with this quantity of OxyContin until late April or early May 2004, when Espanola told Baldassano he was going into a drug rehabilitation

program (see Presentence Report at paragraph 117).

Even assuming that Espinola supplied Baldassano with 200 eighty milligram OxyContin tablets one time per week from September 2002 through April 2004, the total number of eighty milligram OxyContin tablets distributed by Espinola to Baldassano during that period was approximately 16,800.

Ryan Caverly

Ryan Caverly testified that one occasion he purchased 50 OxyContin tablets from Baldassano. When Caverly inquired about obtaining more OxyContin, Baldassano put Caverly in touch with Espinola.

Caverly drove to 63 Endicott Street in Peabody and met Espinola and Michelle Dawicki. On that first occasion, caverly purchased 100 eighty milligram OxyContin tablets from Espinola for $47 per tablet. After that, Caverly made frequent trips to 63 Endicott Street to purchase eighty milligram OxyContin tablets from Espinola for resale to his own customers. He estimated that, depending on demand, he purchased OxyContin tablets "one to two times a week, sometimes two to three times a week" from August 2002 until he began his incarceration on February 23, 2003. Caverly testified that it was difficult to estimate the number of tablets he purchased from Espinola, stating that "sometimes it was 200, sometimes it was 300." The smallest number of pills was the first purchase (through Baldassano) of 50 tablets. Caverly testified that he was not taking drugs during

this time and he remembered it clearly.  Caverly did not testify under a grant of immunity.

Caverly testified that he obtained 100 to 300 eighty milligram OxyContin tablets per week from Espinola between August 2002 and February 2003.  Even assuming that the defendant supplied Caverly with only 100 eighty milligram OxyContin tablets per week over that period, the total number of eighty milligram OxyContin tablets distributed by the Espinola to Caverly was approximately 2,800.  Caverly's testimony about Espinola's prolific distribution of OxyContin corroborates Baldassano's testimony.  Caverly did not testify under a grant of immunity.

Michelle Dawicki

Michelle Dawicki, Espinola's former girlfriend, testified that she used up to five OxyContin tablets per day for the year she lived with Espinola.  Espinola supplied Dawicki with most of the OxyContin she used.  At two eighty milligram OxyContin tablets per day, 730 additional eighty milligram OxyContin tablets should be added to Espinola's Oxycontin total.

Dawicki gave extensive testimony about the nature of the relationship between Espinola and Baldassano. Dawicki testified that she and Espinola sold eighty milligram OxyContin pills from "the house" to Baldassano and that they would deliver the pills to Baldassano at other locations.  Baldassano frequently came over to Espinola's apartment and he obtained OxyContin pills on all or most of his trips there.  Dawicki testified that, on

various occasions, she delivered OxyContin to Baldassano or transported money back to Peabody for Espinola.  Dawicki testified that she knew the person identified by Baldassano as Espinola's supplier, that he came to Espinola's residence once a week, and that he brought OxyContin.  Espinola stored the OxyContin pills in different places, including a deep hole in the floor of a closet in the bathroom.  Dawicki testified that Espinola sold OxyContin for the entire time that she lived with him.

Kevin Teixeira

Teixeira testified that he sold OxyContin for Baldassano. At one point, Teixeira went with Archibald MacLeod to Baldassano's apartment in Lowell to get OxyContin pills. Teixeira was also delivering money to Matthew Cream from his earlier sales of 20 OxyContin pills previously given to him. Teixeira was going there to obtain 20 more pills.  Baldassano and Cream were inside the apartment.  They told Teixeira that the pills were not there yet, that somebody would be coming by, and that he had to wait.  After waiting for about 15 minutes, Teixeira observed a male arrive at the apartment.  Teixeira overheard Cream and Baldassano referring to him by the name "Los" (Baldassano testified that he frequently referred to Carlos Espinola by that nickname).  Teixeira observed that this male had a handgun (possibly a nine-millimeter) tucked into his waist area because the male "flashed" it to everybody in the apartment.

This male went into a separate room with Baldassano for 3-4 minutes.  After that, the male left the apartment and Cream gave Teixeira 20 80-milligram OxyContin pills.  MacLeod also obtained at least 20 OxyContin pills.  Teixeira used one of the pills inside the apartment.  Teixeira identified a photograph of Espinola (Trial Exhibit 39) as depicting the male who arrived at the apartment; Teixeira observed this photograph hanging on the wall of one of the bedrooms in the apartment.

<u>Steven Appt</u>

Appt testified that he purchased OxyContin from Baldassano and Cream on a total of five to six occasions.  Appt further testified that he met Carlos Espinola at a party approximately two years earlier and he saw Espinola on a sporadic basis thereafter.  In December 2003 or January 2004, Appt agreed to give Cream a ride to pick up some OxyContin pills.  Cream directed Appt to drive to the vicinity of 63 Endicott Street in Peabody.  Stating that he was going inside to Carlos's house to get the pills, Cream exited from Appt's vehicle and entered the residence.  After about 10-15 minutes, Appt observed Cream exit the residence with another man whom he recognized as Espinola.  Cream and Espinola entered Espinola's vehicle and they drove away while Appt waited there.  After about 10-15 minutes, they returned.  Espinola entered the residence while Cream entered Appt's vehicle.  Appt observed that Cream now had a bag containing at least 50 80-milligram OxyContin pills.  Cream and

Aptt consumed a few of the pills together. Aptt drove Cream back to Gloucester.

Aptt testified that he was present at Jonathan Mitchell's residence on multiple occasions when Baldassano, Cream, Mitchell, Philip Albert, Keith Behsman, and others would be hanging out. Aptt heard them, primarily Baldassano and Cream, discussing Espinola.

Tom Prendergast

Prendergast testified that he purchased OxyContin from Baldassano "lots of times" beginning in late 2000 and ending in October 2003. He also purchased OxyContin from Matthew Cream, Jason Matthews, Philip Albert, and Joe Torrente. Prendergast testified that at one time, Matthews mentioned that they were getting their OxyContin from a man named Carlos. On another occasion, Matthews mentioned that it was a man named Espinola. Matthews and Baldassano bragged "about how they went to Boston and partied, and how ... Mr. Baldassano's dealer had all sorts of toys," including motorcycles and jet skis. At first, Prendergast thought that Carlos and Espinola were 2 different people but then he determined that it was one person. Baldassano and/or Matthews eventually stated the name Carlos Espinola.

OxyContin Total

As stated previously in this memorandum, the United states believes that the credible trial evidence supports a finding that espinola is responsible for at least 20,300 eighty milligram

OxyContin tablets. This number of Oxycontin tablets is derived from the number of tablets Espinola distributed to Baldassano (at least 16,8000, Caverly (at least 2,800), and to Dawicki (at least 730). In each instance, the United States has made a conservative estimate. The BOL of 36 is achieved with 18,656.72 eighty milligram Oxycontin tablets.

U.S.S.G. § 2D1.1(b)(1)

U.S. Probation has correctly determined that Espinola qualifies for a two level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) because he possessed a handgun while committing his OxyContin offense. Baldassano, Dawicki, Caverly, and Teixeira each testified that they saw Espinola with a handgun. Teixeira testified that Espinola brought a handgun to Baldassano's Lowell apartment when he came there to deliver Oxycontin. Defense counsel's argument that there is no evidence that the gun possessed by Espinola was real is specious. Espinola was security conscious. He had a security camera trained on the entrance to his house to protect himself and the drugs he kept in his apartment. He carried the gun similarly to protect himself, his drugs, and his drug profits. The Court will recall that when defense counsel cross-examined Teixeira about whether he knew if the gun he saw in Espinola's possession was real or a toy, Teixeira questioned why would Espinola carry a toy gun. The simple answer is that he would not. A toy gun would offer Espinola no protection.

**<u>Sentencing Recommendation</u>**

The United States respectfully recommends that the Honorable Court find Espinola responsible for at least 20,300 eighty milligram OxyContin tablets, which would result in a BOL of 36. The United States further asks this Court to increase Espinola's offense level by two levels pursuant to U.S.S.G. § 2D1.1(b)(1) because he possessed a handgun while engaged in the conspiracy to distribute oxycodone. With a two level enhancement, Espinola's TOL would be 38 and his GSR would be 235 months to 293 months.[1]

The United States respectfully requests that the Court impose a sentence that includes a 260 month period of imprisonment. The recommended sentence takes into consideration the enormity of Espinola's crime, the length of time Espinola distributed OxyContin, the amount of Oxycontin distributed by Espinola, and the dire consequences of Espinola's OxyContin distribution on the addicts who abused it, their families, and the entire North shore community.

---

[1] The United States further requests that the Court reject Espinola's baseless request for a role reduction. Espinola has failed to state any compelling reason for a deviation or departure and the United States requests that the Court not give a deviation or a departure.

## Conclusion

For the reasons stated in this memorandum, the United States respectfully requests the Honorable Court to adopt the sentencing recommendations of the United States.

                                Respectfully submitted,

                                MICHAEL J. SULLIVAN
                                United States Attorney

By:  /s/ David G. Tobin
      DAVID G. TOBIN
      Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                        /s/ David G. Tobin
                        DAVID G. TOBIN
                        Assistant United States Attorney

Date: August 11, 2006

Case 1:04-cr-10288-RWZ    Document 419    Filed 08/11/2006    Page 15 of 15